UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
JEFFREY S. SEIGEL,                              :
                 Plaintiff,              :
v.                                              :
                                 :       **OPINION AND ORDER**
STRUCTURE TONE ORGANIZATION,                    :
PAVARINI NE CONSTRUCTION CO.,                   :       19 CV 7307 (VB)
ROBERT YARDIS, and                              :
MICHAEL MELANOPHY,                              :
                    Defendants.             :
--------------------------------------------------------------x

Briccetti, J.:

       Plaintiff Jeffrey S. Seigel, proceeding pro se, brings claims under the Americans with

Disabilities Act ("ADA") and the Family Medical Leave Act ("FMLA"), as well as state-law

claims for breach of contract and tortious interference, against Pavarini North East Construction

Co., LLC ("Pavarini"), plaintiff's former employer; Structure Tone Organization, a group of

companies affiliated with Pavarini; Michael Melanophy, plaintiff's supervisor and Senior Vice

President of Pavarini; and Robert Yardis, the Human Resources Director of Pavarini's parent

company, Structure Tone Holdings, Inc. (together with Melanophy, the "Individual

Defendants").  Plaintiff alleges defendants discriminated against him based on his disabilities,

retaliated against him for complaining about the discrimination and for requesting medical leave,

and breached and interfered with his employment contract with Pavarini.

       Now pending are defendants' motion for summary judgment (Doc. #152) and plaintiff's

motion for leave to file a second amended complaint.  (Doc. #167).

       For the reasons set forth below, the summary judgment motion is GRANTED IN PART

and DENIED IN PART, and the motion for leave to amend is DENIED.

       The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

**BACKGROUND**

I.    Factual Background

The parties have submitted briefs, statements of material facts pursuant to Local Civil Rule 56.1, and affidavits and declarations with exhibits, which together reflect the following factual background.

A.    Defendants' Corporate Structure

From January 2002 to August 13, 2018, plaintiff worked as Director of Business Development for Pavarini, a large construction company.

During the relevant time period, Pavarini was a subsidiary of Structure Tone Holdings, Inc. ("Structure Tone Holdings").  Structure Tone Holdings provided human resources functions to Pavarini and its employees, including issuing workplace policies and codes of conduct governing Pavarini employees.  Structure Tone Holdings referred to itself and its umbrella of construction-related subsidiaries as the "Structure Tone Organization."  (Doc. #152-5 at 36, ECF 37).[1]  The Structure Tone Organization is not a legal entity.

Defendant Michael Melanophy worked alongside plaintiff as Director of Operations until 2016, when Melanophy was promoted to Vice President of Pavarini, and became plaintiff's direct supervisor.  For the relevant time period, defendant Robert J. Yardis was Senior Vice President of Human Resources at Structure Tone Holdings, and thus managed human resources affairs for Pavarini.

---

[1]    "ECF ___" refers to page numbers automatically assigned by the Court's Electronic Case Filing system.

B.      Plaintiff's Pre-Disability Career at Pavarini (2002–2013)

Plaintiff's main responsibilities as Director of Business Development included soliciting

new clients for Pavarini and maintaining relationships with existing clients.

Plaintiff's performance evaluations for 2011–2013 reflected frustration with plaintiff's

inability to develop new business.  (See, e.g., Doc. #160-1 ("Seigel Tr.") at 115, 119).

By 2012, plaintiff had begun complaining to his supervisors, including the Individual

Defendants, that "for years," his annual, discretionary bonus appeared to have hit a plateau of

$5,000.  (Seigel Tr. at 120).  For 2013, plaintiff received an annual bonus of $10,000.

C.      Plaintiff's Cancer Diagnosis and Medical Leave, and Defendants' Anti-
        Retaliation Policy (2014–2015)

In February 2014, plaintiff was diagnosed with a rare bone cancer that required extensive

treatment and resulted in plaintiff taking disability leave from April 2014 until May 1, 2015.

Part of plaintiff's disability leave was protected under the FMLA, which entitles employees up to

twelve weeks of unpaid, job-protected leave per year.  See 29 U.S.C. § 2612(a).

During his disability leave, plaintiff applied for and received Social Security disability

insurance ("SSDI") benefits from the Social Security Administration (the "SSA").  The SSA

agreed with plaintiff's self-assessment that he was "100 % disabled" at the time.  (Seigel Tr. at

261–62; Doc. #160-2).  Plaintiff's disability determination from the SSA was never revoked.

Plaintiff returned from disability leave on May 1, 2015.  He initially worked part-time

and resumed full-time work in November 2015, with a number of agreed-upon accommodations

for his cancer-related disabilities, including working hours limited to 9:00 a.m. to 6:00 p.m., and

the flexibility to attend doctor's appointments and physical therapy sessions in the mornings.

Plaintiff received an annual bonus of $4,600 for each of 2014 and 2015.

In 2015 defendants circulated an "Anti-Retaliation Policy" for Structure Tone Organization affiliates, including Pavarini, effective December 1, 2015.  (Doc. #157-2 at ECF 2–6 ("Anti-Retaliation Policy").  The policy encouraged "prompt[] report[ing] [of] any suspected violation of [Pavarini's] policies or applicable laws" through a number of channels, including the employee's immediate supervisor or local human resources representative.  (Id. at ECF 3).  It also articulated a "strict anti-retaliation policy" by which "employees who raise issues or ask questions, report potential violations of Company policy or law, and participate in Company investigations, will not suffer . . . adverse employment action[s], such as . . .  termination."  (Id. at ECF 4–5).  According to plaintiff, it was "mandatory" for all Structure Tone employees, including plaintiff and the Individual Defendants, to review and sign the Anti-Retaliation Policy. (Seigel Tr. at 69–70).

> D.   Second Director of Business Development, and Plaintiff's Second Medical Leave (2016–2017)

In July 2017, while plaintiff continued to work at Pavarini full-time, Pavarini hired Kathleen Williams as a second Director of Business Development.

In September 2017, plaintiff informed his supervisors of his belief that he had "returned prematurely" from his initial disability leave.  (Seigel Tr. at 173).  Pavarini granted plaintiff's request to take another FMLA leave from September 8, 2017, through November 15, 2017.  At an unspecified point following this FMLA leave, Melanophy expressed frustration at the fact that "[plaintiff's] leave was disruptive to [Pavarini's] business."  (Doc. #152-18 ("Yardis Tr.") at 59–60).

During his 2017 FMLA leave, plaintiff sent an unsolicited memorandum to Frank Renzler, a supervisor in Structure Tone Holdings's "Global Services" unit, lobbying for an unspecified "senior role" in the unit.  (Doc. #152-11).  The Global Services unit's main purpose

was to coordinate and supervise construction projects involving international clients.  Despite

multiple inquiries from plaintiff, Mr. Renzler replied that no such position was available.  At

some point thereafter, one of plaintiff's co-workers at the time, Berney Smyth, was transferred to

the Global Services unit as an account executive.  The account executive position entailed

supervising and aligning resources necessary for global construction projects.

Plaintiff returned from FMLA leave on November 16, 2017, and thereafter continued to

work full-time, with previously agreed-upon accommodations for his disabilities.

For each of 2016 and 2017, plaintiff continued to receive average to below-average

evaluations regarding his ability to bring in new customers.  (Doc. #157-2 at ECF 13–15; Doc.

#152-14).  During each year, plaintiff received approximately $5,000 as an annual bonus.  Ms.

Williams received an annual bonus of $7,500 in 2017.

> E.      Plaintiff's Third Medical Leave, Internal Complaint, and Request for Leave
>         Extension (2018)

In April 2018, Melanophy divided Pavarini's marketing territory between plaintiff and

Ms. Williams, such that Ms. Williams was responsible for business development in Connecticut,

and plaintiff was responsible for business development in New York.

On April 15, 2018, plaintiff went on medical leave a third time, again under the FMLA,

with an anticipated return date of June 18, 2018.  While on leave, plaintiff attended a cancer

wellness and rehabilitation center in Massachusetts in an effort to improve his cancer-treatment

related symptoms.  Also during this time, plaintiff applied for short-term disability benefits from

MetLife, Pavarini's short-term disability carrier.  MetLife initially rejected plaintiff's claim.

On May 29, 2018, plaintiff, while still on FMLA leave, emailed Yardis asking whether

Pavarini would be amenable to an "ADA reasonable accommodation extension to my FMLA

period."  (Doc. #152-15 ("Seigel Complaint")).  Plaintiff also raised "two serious employment

concerns":  (i) his view that the dividing of marketing territories between himself and Ms. Williams constituted a "demotion" under the FMLA, and (ii) his view that his bonuses for 2016 and 2017 were "10-20 times" less than the bonuses received by the other directors at Pavarini, which, according to plaintiff, could be a "basis for a viable claim" under the ADA.  (Id.).

On June 5, 2018, Yardis sent plaintiff a letter via certified mail advising him that his FMLA leave was about to expire on June 18, 2018, any requests for additional leave would require supporting medical documentation, and plaintiff's failure to respond by June 13, 2018, would be interpreted as an abandonment of plaintiff's employment with Pavarini.  (Doc. #157 at ECF 27–28).

On June 8, 2018, plaintiff advised the Individual Defendants via email he would return to work on June 18, 2018, as originally planned, because he "d[id] not want to make things complicated by extending FMLA."  (Doc. #157 at ECF 23).  Plaintiff again requested a meeting to "discuss some serious EEOC issues such as recent demotion . . . and inappropriate bonuses which were based on disability years."  (Id.)

F.    Plaintiff's Return to Work and Termination of Employment (2018)

Plaintiff returned to work full-time on June 18, 2018.

On June 29, 2018, Ms. Williams complained to the Individual Defendants via email about an "uncomfortable discussion" she had with plaintiff that day, in which plaintiff "decided to stand and rant" about Ms. Williams and a purportedly coordinated attempt to encroach on his marketing territory.  (Doc. #157-3 at ECF 25–26).

Melanophy met with plaintiff on July 2, 2018, to discuss the June 29, 2018, incident, and memorialized the discussion in an email to Yardis.  (Doc. #157-3 ("Melanophy Email") at ECF 23).  Melanophy informed Yardis that plaintiff had raised the possibility of going on FMLA

leave again in September; Melanophy then assured Yardis "the bottom line was I told him it's time to produce—there are no free rides anymore." (Id.)

Also on July 2, 2018, plaintiff filed an appeal with MetLife challenging the denial of his claim for short-term disability benefits. (Doc. #160-5 at ECF 4). Plaintiff argued to MetLife that as of May 7, 2018, he could "no longer perform [his] full-time professional responsibilities," including "attending meetings, business lunches, and travelling with other employees," which plaintiff described as "the necessary functions of [his] role." (Id.). Plaintiff further explained he sought short-term disability benefits to cover a period of twenty-six weeks, retroactively beginning on May 7, 2018, during which time he planned to return to the Massachusetts rehabilitation center to manage his symptoms. On July 30, 2018, MetLife reversed its decision and granted plaintiff's request for short-term disability benefits.

On August 13, 2018, the Individual Defendants met with plaintiff to discuss the termination of his employment. Melanophy advised plaintiff "his position was being eliminated as the business unit cannot afford to subsidize two business development people going forward." (Doc. #157-1 ("Termination Notes") at ECF 40–41).

On December 5, 2018, plaintiff applied for disability benefits from Cigna, Pavarini's long-term disability insurance carrier. Plaintiff claimed he suffered from a "permanent disability" and "cannot work in a professional office environment at this time." (Doc. #160-7 ("Cigna Claim") at ECF 6).

II.   Relevant Procedural History and Proposed Second Amended Complaint

A.   Procedural History

Plaintiff commenced the instant action on April 29, 2019, naming Melanophy, Yardis, Pavarini, and Structure Tone Organization as defendants. (Doc. #1).

On May 26, 2020, the Court issued a Civil Case Discovery Plan and Scheduling Order, which established a deadline of June 26, 2020, for the parties to file any motions for leave to amend the complaint or join additional parties.  (Doc. #34).

On June 22, 2020, plaintiff filed a motion to amend the complaint to include a claim for tortious interference with contract.  The Court granted plaintiff's motion by Memorandum Opinion and Order dated October 13, 2020, and plaintiff filed the amended complaint on November 2, 2020.  (Doc. #72).

The amended complaint is the operative complaint in this action and continues to name Melanophy, Yardis, Pavarini, and Structure Tone Organization as defendants.

Thereafter, the parties moved for, and the Court granted, four extensions of the discovery schedule.  All discovery closed on September 8, 2021.  (Doc. #107).  Throughout this period, plaintiff, although proceeding pro se, was represented by pro bono counsel for the purpose of conducting discovery.  At no time did the parties request an extension of the June 26, 2020, deadline to move to amend the pleadings or join additional parties.  (See Docs. ## 76, 80, 99, 107).

B.      Proposed Second Amended Complaint

On November 29, 2021, defendants served plaintiff with their summary judgment motion.[2]  As discussed below, defendants argued, in part, that Structure Tone Organization should be dismissed from this action because it is not a corporate entity.

_____

[2]      To facilitate meaningful settlement discussions, the Court directed the parties to serve their summary judgment motion papers on each other, but not to file those papers unless and until they informed the Court a settlement could not be reached.  (Doc. #139).  The parties informed the Court a settlement could not be reached on March 31, 2022.  (Doc. #144).  The Court thus ordered the parties to file their summary judgment papers by April 8, 2022.  (Doc. #145).

As part of his opposition to the summary judgment motion, which plaintiff served on defendants on December 30, 2021, plaintiff requested, for the first time, leave from the Court to file a second amended complaint to add "STO Building Group" as a defendant.  (Doc. #151 ("Pl. Mem.") at 24).

Plaintiff maintained his intent was always "to sue the parent of Pavarini"; he had always believed Structure Tone Organization to be the parent company of the Pavarini; and he did not know he was mistaken until Yardis testified at his deposition in this case on July 12, 2021, that STO Building Group was actually the parent company of Pavarini.  (Doc. #169 at 2).

Plaintiff formally moved for leave to amend on September 16, 2022, while defendants' summary judgment motion was still pending before this Court.  The allegations in plaintiff's proposed second amendment complaint mirror those in the amended complaint, but the proposed second amended complaint names STO Building Group as an additional defendant for all claims for which Structure Tone Organization is named as a defendant.  (Doc. #174-1).[3]

## DISCUSSION

I.  <u>Summary Judgment Motion</u>

A.  <u>Standard of Review</u>

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

---

[3]      Plaintiff initially requested leave to amend to add Global Infrastructure Solutions Inc. ("GISI"), in addition to STO Building Group, but then stated in his reply he "will no longer be adding GISI as a Defendant."  (Doc. #174 ("Pl. Reply") at 1).

56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).[4]

A fact is material when it "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." <u>Wilson v. Nw. Mut. Ins. Co.</u>, 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to demonstrate the absence of any genuine issue of material fact. <u>Zalaski v. Bridgeport Police Dep't</u>, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 322–23. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." <u>Brown v. Eli Lilly & Co.</u>, 654 F.3d 347, 358 (2d Cir. 2011). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury reasonably could find for him. <u>Dawson v. County of Westchester</u>, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws

---

[4]    Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper.  Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

B.      Claims Against Structure Tone Organization

Structure Tone Organization argues all claims against it should be dismissed because there is no such legal entity.

The Court agrees.

"Both capacity to be sued and legal existence are prerequisites to the suability of an entity." Roby v. Corp. of Lloyd's, 796 F. Supp. 103, 110 (S.D.N.Y. 1992), aff'd, 996 F.2d 1353 (2d Cir. 1993).  It is well settled that "an association, if it is not a corporation, [must have] received by appropriate legislation a legal status before it, or its members, may be sued in the name of the group." Id. (quoting United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 351 (1922)).

Here, it is undisputed that Structure Tone Organization is not a distinct legal entity, but rather a collective name for the group of subsidiaries housed under the Structure Tone Holdings umbrella.

Accordingly, all claims against Structure Tone Organization must be dismissed.

C.      ADA Discrimination Claims Against Pavarini

Pavarini argues plaintiff's ADA discrimination claims based on a disproportionate bonus and a failure to promote must be dismissed because plaintiff was not qualified to perform the essential functions of his job as a matter of law.

The Court agrees plaintiff's ADA discrimination claims must be dismissed, but for different reasons; namely that plaintiff fails to raise a genuine issue of material fact that he suffered an adverse employment action or that the purported adverse action was "caused" by plaintiff's disabilities.

        1.    <u>Legal Standard</u>

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  Disability discrimination claims are evaluated under the burden-shifting framework articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>See</u> <u>McBride v. BIC Consumer Prods. Mfg. Co.</u>, 583 F.3d 92, 96 (2d Cir. 2009).

The <u>McDonnell Douglas</u> analysis proceeds in three steps:  "A plaintiff must establish a <u>prima</u> <u>facie</u> case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."  <u>Sista v. CDC Ixis N. Am., Inc.</u>, 445 F.3d 161, 169 (2d Cir. 2006).

First, "[t]o establish a <u>prima</u> <u>facie</u> case [of discrimination] under the ADA, a plaintiff must show by a preponderance of the evidence that:  (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability."  <u>Sista v. CDC Ixis N. Am., Inc.</u>, 445 F.3d at 169.

"To qualify as an adverse employment action, the employer's action toward the plaintiff must be materially adverse" with respect to "the terms and conditions of employment."  <u>Davis v.</u>

New York City Dep't of Educ., 804 F.3d 231, 235 (2d Cir. 2015).  The action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."  Id.

The causation element "may be satisfied in a variety of ways including:  actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus, [or] preferential treatment given to employees outside the protected class."  Davis v. N.Y.C. Dep't of Educ., 2014 WL 917142, at *8 (E.D.N.Y. Mar. 7, 2014), aff'd, 804 F.3d 231 (2d Cir. 2015).[5]

At the second step of the McDonnell Douglas analysis, the employer bears the burden of putting forth a legitimate, non-discriminatory reason for the plaintiff's termination.  McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d at 96.

At the third step, the plaintiff must present "sufficient admissible evidence from which a rational finder of fact could infer that more likely than not [the plaintiff] was the victim of intentional discrimination."  Bickerstaff v. Vassar Coll., 196 F.3d 435, 447 (2d Cir. 1999).  In the ADA discrimination context, this burden entails raising a triable issue that the plaintiff's disability "was the but-for cause of any adverse employment action."  Natofsky v. City of New York, 921 F.3d 337, 348 (2d Cir. 2019).

> 2.   Analysis

> a.   Discriminatory Bonus Claim Against Pavarini

Here, no rational juror could find that Pavarini's payment of bonuses to plaintiff violated the ADA.

First, plaintiff cannot adduce a genuine factual dispute that his 2016 and 2017 bonuses were adverse employment actions.  That is, although plaintiff challenges the $5,000 he received

---

[5]      Plaintiff will be provided copies of all unpublished opinions cited in this decision.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

for each of those years, he cannot dispute that by 2012, he had already been receiving an annual bonus of $5,000 "for years" before he finally received $10,000 for 2013. (Seigel Tr. at 120, 122). Moreover, plaintiff fails to identify any similarly situated, non-disabled co-workers who received a substantially greater amount in bonus payments for either at-issue year. The record thus cannot reasonably support an inference that plaintiff's 2016 and 2017 bonuses reflected a "materially adverse change" in his annual bonus payments, either historically or in comparison to plaintiff's similarly situated co-workers.

Second, even if plaintiff's bonuses for 2016 and 2017 constituted adverse employment actions, plaintiff fails to raise a triable issue that his disabilities were the "but-for" cause of his purportedly disproportionate bonuses. That is, plaintiff offers no direct evidence of discriminatory animus behind the bonus decision-making for either year, nor does he identify any other evidence to support his speculative assertion that "two other Directors received bonuses 10-20 times [his] bonus." (Seigel Complaint). To the contrary, the record reflects that plaintiff's <u>most</u> similarly situated co-worker, Ms. Williams, received a bonus of $7,500 for 2017. And, in the case of Ms. Williams, plaintiff offers no evidence suggesting Pavarini's non-discriminatory reasons for the disparity—plaintiff's relatively poor performance—was pretext.

Accordingly, plaintiff's ADA discrimination claim based on his 2016 and 2017 bonuses must be dismissed.

b.   <u>Failure-to-Promote Claim Against Pavarini</u>

Here, plaintiff fails to proffer sufficient evidence from which a rational juror could find <u>Pavarini</u> liable for a failure to "promote" plaintiff to a position at Structure Tone Holdings. Specifically, it is undisputed that the "senior role" plaintiff sought at Structure Tone Holdings was housed in the Global Services unit of Structure Tone Holdings, a separate, non-party

14

corporate entity, and the ultimate decision on plaintiff's request rested with Frank Renzler, the

Head of Global Services of Structure Tone Holdings.  By contrast, plaintiff offers no evidence to

suggest Pavarini played any role in Mr. Renzler's decision beyond mere speculation that

Melanophy, the Vice President of Pavarini, "may" have influenced Structure Tone Holdings's

decision.  (See, e.g., Seigel Tr. at 210–11 (suggesting Melanophy "probably" spoke to Mr.

Renzler about his intention to fire plaintiff "[b]ecause we're part of a $4 billion company")).

     Accordingly, the failure-to-promote claim under the ADA must be dismissed.[6]

D.     <u>ADA Retaliation Claim</u>

     Pavarini argues the ADA retaliation claim against it must be dismissed because plaintiff

is judicially estopped from asserting that claim.

     The Court disagrees.

1.     <u>Legal Standard</u>

     A retaliation claim under the ADA is governed by the burden-shifting framework set

forth in <u>McDonnell Douglas</u> and discussed above.

     To make out a <u>prima facie</u> case of retaliation under the ADA, a plaintiff must show "(1)

he engaged in [protected activity]; (2) the employer was aware of this activity; (3) the employer

took adverse employment action against him; and (4) a causal connection exists between the

---

[6]     Defendants' contention that plaintiff's failure-to-promote claim is "nowhere to be found in the EEOC charge" is not correct.  (Doc. #152-2 ("Defs. Mem.") at 15).  Although plaintiff did not expressly list a failure-to-promote claim among the four "issues [he] would like to discuss" in that charge, he did acknowledge that "[t]wo other employees were promoted."  (Doc. #152-7 at ECF 3).  Because the Court concludes the failure-to-promote claim fails as a matter of law, it need not decide whether the reference to the promotion of other employees is sufficient to raise a triable issue regarding's plaintiff exhaustion of his administrative remedies.

alleged adverse action and the protected activity." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).[7]

As a general matter, a challenge to an employment action is a "protected activity" under the ADA only if it gives "[some] specific indication that [the plaintiff] was protesting discrimination." Natofsky v. City of New York, 921 F.3d at 354. Requesting a reasonable accommodation for a disability under the ADA also constitutes a protected activity. See Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 149 (2d Cir. 2002). "This is true even if the plaintiff's claim that he was entitled to a reasonable accommodation is mistaken, so long as it was made in good faith." Rodriguez v. Atria Senior Living Grp., Inc., 887 F. Supp. 2d 503, 512 (S.D.N.Y. 2012).

Temporal proximity between an employee's complaint of discrimination or request for reasonable accommodation and his discharge is typically sufficient to infer the causation element of the prima facie case of retaliation under the ADA. See Treglia v. Town of Manlius, 313 F.3d at 720.

However, the Court agrees with the weight of authority in this Circuit that a plaintiff in the ADA retaliation context bears the ultimate burden of proving the retaliation was a "but for"

---

[7]     Defendants cite a non-binding summary order issued by the Second Circuit, Wakim v. Michael Cetta, Inc., 559 F. App'x 109, 110 (2d Cir. 2014), for the proposition that a plaintiff judicially estopped from arguing he is a "qualified individual" under the ADA may not bring an ADA retaliation claim. However, it is well settled that "unlike a plaintiff in an ADA discrimination case, a plaintiff in a[n] ADA retaliation case need not establish that he is a 'qualified individual with a disability.'" Treglia v. Town of Manlius, 181 F. Supp. 2d 83, 88–89 (N.D.N.Y. 2001), vacated on other grounds, 313 F.3d at 719 ("A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law."); see also Krouse v. Am. Sterilizer Co., 126 F.3d 494, 502 (3d Cir. 1997) ("An individual who is adjudged not to be a 'qualified individual with a disability' may still pursue a retaliation claim under the ADA.").

cause of the adverse employment action.  See, e.g., Monsour v. N.Y. State Office for People with Developmental Disabilities, 2018 WL 3349233, at *11 n.17 (N.D.N.Y. July 9, 2018) (collecting cases).

       2.    Analysis

Here, plaintiff raises a genuine issue of material fact that his employment was terminated in retaliation for his May 29, 2018, email to Yardis.

As an initial matter, the record contains sufficient evidence to make out a prima facie case of retaliation under the ADA.  That is, (i) the ADA concerns raised in plaintiff's email regarding his bonuses and demotion, as well as his "request [for] an ADA reasonable accommodation extension to my FMLA Period," could each constitute activity protected by the ADA (Seigel Complaint); (ii) Pavarini was aware of the May 29 email; and (iii) Pavarini first raised the possibility of termination in Yardis's letter dated June 5, 2018, just one week after the May 29 email, and then actually followed through with terminating plaintiff's employment on August 13, 2018, only two-and-a-half months after the May 29 email.

Pavarini proffers at least three facially legitimate, non-discriminatory reasons for terminating plaintiff's employment:  (i) Pavarini could no longer "afford to subsidize two business development people going forward" (Termination Notes at ECF 40–41);(ii) plaintiff was not adequately performing the business development responsibilities expected of him; and (iii) plaintiff's office outburst directed at Ms. Williams created an uncomfortable, disruptive working environment.

Although a close call, the record contains sufficient direct evidence of retaliatory animus for a rational juror to disregard these proffered non-discriminatory reasons as pretext. Specifically, in an email to Yardis dated July 2, 2018—approximately one month after the May

29, 2018, email from plaintiff—Melanophy summarized a conversation he had with plaintiff that day and emphasized to Yardis that plaintiff "will not be given a bonus for under achieving" and "there are no free rides anymore." (Melanophy Email). Plaintiff also testified at his deposition that in response to plaintiff's concerns regarding the "demotion," Melanophy told plaintiff to "stop whining." (Seigel Tr. at 283). Finally, Yardis admitted in his deposition that there appeared to be an internal consensus that plaintiff's medical leaves were "disruptive to [the] business" and his "medical conditions seemed to be interfering with his ability to conduct his responsibilities." (Yardis Tr. at 59–60). Taken together and construed as a whole in a light most favorable to plaintiff, this evidence—along with the timing of the termination—raises a reasonable inference that but for his May 29, 2018, email, plaintiff would not have been fired.

     E.     <u>FMLA Retaliation Claim</u>

Pavarini argues plaintiff's FMLA retaliation claims based on territorial "demotion" and termination must be dismissed as a matter law.

The Court agrees as to the territorial demotion claim, but disagrees as to the termination claim.

     1.     <u>Legal Standard</u>

A retaliation claim under the FMLA is governed by the same burden-shifting analysis set forth in <u>McDonnell Douglas</u> and discussed above.

"To establish a prima faci[e] case of FMLA retaliation, a plaintiff must establish that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." <u>Graziadio v. Culinary Inst. of Am.</u>, 817 F.3d 415, 429 (2d Cir. 2016).

18

Although the Second Circuit has not addressed the issue, the Court agrees with those courts that have held a "qualified person" under the FMLA should be analyzed in the same way as a "qualified employee" under the ADA—that is, an employee able to perform "essential functions" of his job with or without "reasonable accommodations."  See, e.g., Verhoff v. Time Warner Cable, Inc., 299 F. App'x 488, 497–98 (6th Cir. 2008) (summary order) (comparing relevant statutory provisions).

In Cleveland v. Pol'y Mgmt. Sys. Corp., 526 U.S. 795, 807 (1999), the Supreme Court articulated a framework to determine whether a party is judicially estopped from arguing he is "qualified for his position" under the ADA due to potentially contradictory statements made in support of an application for disability benefits:

> When faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodations."

Id. at 807.  This is because, "when the SSA determines whether an individual is disabled for SSDI purposes, it does not take the possibility of 'reasonable accommodation' into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI."  Id. at 803.

The Cleveland analysis is not limited to SSDI claims, and may also be applied to applications for both short-term and long-term disability benefits.  See, e.g., Parker v. Columbia Pictures Indus., 204 F.3d 326, 335 (2d Cir. 2000) (long-term disability); Abbate v. Cendant Mobility Servs. Corp., 2007 WL 2021868, at *6 (D. Conn. July 13, 2007) (short-term disability).

Finally, the ultimate burden of proving causation under an FMLA retaliation claim is more lenient than the but-for causation necessary to prove an ADA claim—a plaintiff asserting an FMLA retaliation claim need only show the "taking of FMLA leave [w]as a negative factor in employment actions."  Woods v. START Treatment & Recovery Ctrs., Inc., 864 F.3d 158, 168 (2d Cir. 2017).

2.    Analysis

a.    Territory Demotion

Here, plaintiff fails to offer evidence from which a rational juror could find the dividing of plaintiff's marketing territory was more than an "alteration of job responsibilities."  Davis v. N.Y.C. Dep't of Educ., 804 F.3d at 235.  That is, even assuming plaintiff's marketing territory was reduced by half, plaintiff fails to offer more than a scintilla of evidence as to how the division of territory adversely impacted the terms and conditions of his employment, particularly when, as here, the record reflects the division impacted both plaintiff and Ms. Williams equally. And although plaintiff complained the New York territory was "lethargic," he offers no evidence to suggest the Connecticut territory was any less lethargic, or that plaintiff was otherwise disadvantaged by being tasked with New York instead of Connecticut.  (Doc. #157 at ECF 19).

Accordingly, plaintiff's FMLA retaliation claim arising out of the dividing of his marketing territory must be dismissed.

b.    Termination of Employment

However, plaintiff does raise a triable issue of material fact that his employment was terminated in retaliation for discussing an extension or renewal of his FMLA leave.  That is, a rational juror could find that plaintiff's May 29, 2018, email discussing the possibility of an "ADA extension" to his FMLA leave, and his July 5, 2018, conversation with Melanophy about

20

taking another FMLA leave in September, each entailed an exercise of plaintiff's protected rights under the FMLA.  A rational juror could also infer that the discussions of FMLA leave were "negative factors" in the termination of plaintiff's employment from the timing of the termination, along with the documented perception that plaintiff was being given a "free ride." (Melanophy Email).

Pavarini argues plaintiff is bound by judicial estoppel to his own statements to the SSA, MetLife, and Cigna regarding his disabilities, and thus cannot prove he was ever "qualified" for the position from which he now claims retaliatory termination.  However, even assuming the truth of plaintiff's characterizations of his disabilities in those submissions, a rational juror could find plaintiff could perform the essential functions of his business development role <u>with reasonable accommodations</u>.

With respect to the determination by the SSA that plaintiff was "disabled" effective April 2014, Pavarini does not identify any statement plaintiff made to the SSA regarding his ability to work that "directly contradicts" his allegations in the instant action confirming he <u>could</u> work with reasonable accommodations.  <u>See also</u> <u>Morse v. JetBlue Airways Corp.</u>, 941 F. Supp. 2d 274, 289 (E.D.N.Y. 2013) ("[A] simple averment that one is disabled for the purposes of an SSDI application does not preclude the argument that one could, with reasonable accommodation, be gainfully employed.").

Plaintiff's statements to MetLife present a closer question.  Specifically, plaintiff argued in a July 2, 2018, letter to MetLife that as a result of his disabilities, he could "no longer perform [his] full-time professional responsibilities," including "working in an office environment, attending meetings, business lunches and traveling with other employees," and thus required short-term disability approval to cover a total of twenty-six weeks.  (Doc. #160-5 at ECF 4).

Although facially inconsistent with plaintiff's position on his ability to work in this action—even with the previously-agreed upon reasonable accommodations—a rational juror could nevertheless find plaintiff <u>would</u> be capable of performing the essential functions of his job with the <u>additional</u> reasonable accommodation of additional medical leave. <u>See</u> <u>Fredenburg v. Contra Costa Cnty. Dep't of Health Servs.</u>, 172 F.3d 1176, 1181 (9th Cir. 1999) (receipt of short-term state disability benefits did not justify judicial estoppel in ADA action because "[t]he whole purpose of placing a person on leave is that he or she may eventually return to work").[8]

Finally, plaintiff's statements in support of his claim for long-term disability benefits from Cigna, which were made on December 5, 2018, are not relevant to determining whether plaintiff was able to work with reasonable accommodations on August 13, 2018, the date plaintiff was terminated. <u>See</u> <u>Cleveland v. Pol'y Mgmt. Sys. Corp.</u>, 526 U.S. at 805 ("[T]he nature of an individual's disability may change over time, so that a statement about that disability at the time of an individual's application for SSDI benefits may not reflect an individual's capacities at the time of the relevant employment decision.").[9]

---

[8]      The Second Circuit has not resolved whether medical leave itself can constitute a reasonable accommodation under the ADA.  However, "courts considering this question have concluded that a leave of absence may be a reasonable accommodation where it is finite and will be reasonably likely to enable the employee to return to work."  <u>Graves v. Finch Pruyn & Co.</u>, 457 F.3d 186 n.6 (2d Cir. 2006) (collecting cases).  The Court agrees with this weight of authority.  Defendants may persuasively argue plaintiff's requested leave was too long or his likelihood of rehabilitating too uncertain to be reasonable, but those questions of fact must be decided by a jury.

[9]      Defendants accuse plaintiff of "actively destroy[ing] evidence of his communications with the SSA and carriers about his applications."  (Defs. Mem. at 10; <u>see also</u> Seigel Tr. at 287–88 (admitting to not producing a "disability questionnaire" in connection with his application to Cigna); Cigna Claim at ECF 4 (plaintiff asking Cigna to "Please Keep Confidential I don't want employer to know condition/symptoms")).  However, defendants also explain that plaintiff's conduct—while concerning—caused them to subpoena those disability entities directly, which did, in fact, yield at least some of the missing documents.  (Def. Br. at 10).  In light of defendants' apparently successful attempts to retrieve the documents they sought, and the lack of

Accordingly, the FMLA retaliation claim against Pavarini and the Individual Defendants may proceed.[10]

F.      State-Law Claims

1.      Breach of Contract

Pavarini argues plaintiff's breach of contract claim must be dismissed as a matter of law because plaintiff does not offer evidence of a "contract" in the first instance.

The Court disagrees.

a.      Legal Standard

Under New York law,[11] "an employment relationship is presumed to be a hiring at will, terminable at any time by either party." Baron v. Port Auth. of N.Y. & N.J., 271 F.3d 81, 85 (2d Cir. 2001).  New York does, however, recognize breach of contract claims arising out of a

---

any formal motion for relief with respect to plaintiff's conduct, the Court declines to take any action regarding plaintiff's conduct at this time.

[10]     An individual may be held liable under the FMLA if he or she qualifies as an "employer" under 29 U.S.C. § 2611(4)(A)(ii)(I).  The Second Circuit applies the "economic reality" test to evaluate whether an individual is an "employer," and therefore individually liable under the FMLA.  Graziadio v. Culinary Inst. of Am., 817 F.3d at 422.  The test comprises several nonexclusive and overlapping factors intended to evaluate whether the employer "controlled in whole or in part plaintiff's rights under the FMLA."  (Id.)  Here, there are genuine factual disputes as to whether the Individual Defendants exerted such control over plaintiff's rights, at least in part, as reflected in plaintiff's brief.  (See Pl. Mem. at 6.)

[11]     In a footnote in their reply brief, defendants suggest that Connecticut law, as opposed to New York law, ought to apply to plaintiff's state-law claims because plaintiff was employed in Connecticut by a Connecticut employer.  (Doc. #147 at 9 n.6).  Defendants nevertheless rely primarily on New York law to address plaintiff's claims, and argue plaintiff's claims fail under either state's laws.  New York's choice-of-law rules dictate that "[w]here a choice of law clause is not dispositive, [t]he first step . . . is to determine whether there is an actual conflict between the laws of the jurisdictions involved."  Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y., 822 F.3d 620, 641 (2d Cir. 2016).  Here, because the parties' submissions do not indicate—nor has the Court independently uncovered—an actual conflict between New York and Connecticut law regarding plaintiff's state-law claims, the Court will apply New York law.

written employment policy provided the plaintiff demonstrates "(1) an express written policy limiting the employer's right of discharge exists, (2) the employer (or one of its authorized representatives) made the employee aware of this policy, and (3) the employee detrimentally relied on the policy in accepting or continuing employment." Dutt v. Young Adult Inst., Inc., 2018 WL 3148360, at *5 (S.D.N.Y. June 26, 2018) (quoting Baron v. Port Auth. of N.Y. & N.J., 271 F.3d at 85).

In determining whether an employee detrimentally relied on a given employment policy, the Court must evaluate the totality of the circumstances. O'Neill v. N.Y. Univ., 97 A.D.3d 199, 211 (1st Dep't 2012). Indicia of detrimental reliance include the presence or absence of language in the policy disclaiming any contractual rights, whether the employee reported purported breaches of the policy in the manner contemplated by the at-issue policy, and evidence the employee turned down other offers of employment in reliance on the policy. See, e.g., Lobosco v. N.Y. Tel. Co./NYNEX, 96 N.Y.2d 312, 317 (2001) (disclaimer language); O'Neill v. N.Y. Univ., 97 A.D.3d at 212 (compliance with applicable procedures and turning down employment offers).

b.      Analysis

Here, plaintiff raises genuine issues of fact that the Anti-Retaliation Policy was an implied contract, and Pavarini breached that contract.

With respect to the existence of the implied contract, a rational juror could find the language in the Anti-Retaliation Policy expressly limited Pavarini's ability to terminate employment when the employee complains of discrimination. (See Anti-Retaliation Policy at ECF 4–5).

In addition, there is sufficient evidence for a rational juror to find Pavarini made the Anti-Retaliation Policy known to plaintiff and plaintiff relied on the Anti-Retaliation Policy to his detriment in continuing employment at Pavarini.  Indeed, plaintiff supplies a version of the Anti-Retaliation Policy effective December 1, 2015, at which time plaintiff was still employed with Pavarini.  Plaintiff does not offer evidence he was aware of the Anti-Retaliation Policy at the time of his employment, but he nevertheless testified that signing the Anti-Retaliation Policy was "mandatory" for all Pavarini employees, including plaintiff and the Individual Defendants, in 2015.  (Seigel Tr. at 69–70).  Moreover, in voicing his disability-discrimination concerns to Melanophy, his supervisor, and Yardis, the Human Resources Director, plaintiff arguably followed the internal complaint system contemplated by the Anti-Retaliation Policy.  (See Anti-Retaliation Policy at ECF 3).  Thus, the totality of these circumstances, when viewed in a light most favorable to the plaintiff, raises a triable issue of fact as to whether plaintiff continued his employment at Pavarini in detrimental reliance on the Anti-Retaliation Policy.

Finally, assuming it is genuinely disputed the Anti-Retaliation Policy is, in fact, an implied anti-retaliation contract, plaintiff raises a genuine issue of fact regarding whether Pavarini breached the contract.  That is, a rational juror could find plaintiff complied with the Anti-Retaliation Policy by complaining of discrimination to the Individual Defendants on May 29, 2018; Pavarini breached the Anti-Retaliation Policy by terminating plaintiff after the May 29, 2018, email; and plaintiff suffered damages in the form of lost wages as result of the breach.

Accordingly, the breach of contract claim against Pavarini may proceed.

2.      <u>Tortious Interference with Contract</u>

The Individual Defendants argue plaintiff's tortious interference with contract claim fails as a matter of law because they are agents of Pavarini and therefore cannot interfere with a contract with Pavarini.

The Court agrees.

Under New York law, a tortious interference with contract claim requires a plaintiff to show (i) "the existence of a valid contract between the plaintiff and a third party"; (ii) "defendant's knowledge of that contract"; (iii) "defendant's intentional procurement of the third-party's breach of the contract without justification"; (iv) "actual breach of the contract"; and (v) "damages resulting therefrom." <u>See</u> <u>Rich v. Fox News Network, LLC</u>, 939 F.3d 112, 126–27 (2d Cir. 2019).

"[A] plaintiff bringing a tortious interference claim must show that the defendants were <u>not parties to the contract</u>." <u>Finley v. Giacobbe</u>, 79 F.3d 1285, 1295 (2d Cir. 1996) (citing New York law).  "[T]o show that a defendant-employee is a 'third party,' a plaintiff must show that the defendant-employee has exceeded the bounds of his or her authority." <u>Id</u>.  "A supervisor is considered to have acted outside the scope of his employment if there is evidence that the supervisor's manner of interference involved independent tortious acts such as fraud or misrepresentations, or that he acted purely from malice or self-interest." <u>Cohen v. Davis</u>, 926 F. Supp. 399, 404 (S.D.N.Y. 1996) (citing New York law).

Here, it is undisputed the Individual Defendants are agents of Pavarini, either directly, in the case of Melanophy, or indirectly due to the human resources functions Yardis provided for Pavarini.

Moreover, plaintiff fails to supply any evidence from which a rational juror could infer either of the Individual Defendants committed an independent tort or acted purely from malice or self-interest.  Indeed, the record is replete with evidence suggesting that, far from acting out of personal gain or satisfaction, the Individual Defendants acted to serve the financial interests of Pavarini, even in the course of their alleged discrimination and retaliation.  (See, e.g., Yardis Tr. at 59–60 ("Jeff's medical conditions seemed to be interfering with his ability to conduct his responsibilities in our business unit."))

Accordingly, the tortious interference claim must be dismissed.

II.    Motion to Amend

A.    Standard of Review

1.    Rule 15(a)(2)

Rule 15(a)(2) provides the Court "should freely give leave" to amend a complaint "when justice so requires."

The Supreme Court has stated that:

> [i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be freely given.

Foman v. Davis, 371 U.S. 178, 182 (1962).

2.    Rule 21

When a party moves to amend his complaint to add new parties, Rule 21 also applies.  Chow v. Shorefront Operating LLC, 2021 WL 225933, at *3 (E.D.N.Y. Jan. 20, 2021). Rule 21 provides the Court may add parties "at any time, on just terms."  Thus, the Court has "broad discretion to permit a change in the parties at any stage of a litigation."  Four Star Cap.

Corp. v. NYNEX Corp., 183 F.R.D. 91, 98 (S.D.N.Y. 1997).  In deciding whether to permit the addition of a new party, courts have considered "whether the party seeking joinder has unnecessarily delayed the proceedings; and whether the nonmovant would be prejudiced by the addition."  Id.

       3.       Rule 16(b)(4)

In addition, Rule 16(b)(4) applies when a party moves to amend a pleading after a court-ordered deadline to do so has expired.  The Rule provides the Court's scheduling order "may be modified only for good cause and with the judge's consent."  Thus, when a motion to amend a pleading is made after the deadline has expired, "the lenient standard under Rule 15(a) . . . must be balanced against the requirement under Rule 16(b) that the Court's scheduling order shall not be modified except upon a showing of good cause."  Holmes v. Grubman, 568 F.3d 329, 334–35 (2d Cir. 2009).  "The burden of demonstrating good cause rests with the movant."  Ritchie Risk-Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC, 282 F.R.D. 76, 79 (S.D.N.Y. 2012).

"Whether good cause exists turns on the diligence of the moving party."  Holmes v. Grubman, 568 F.3d at 335.  For example, "[t]he court may deny leave to amend where the party seeking it knew or should have known the facts sought to be added to the complaint."  Mason Tenders Dist. Council v. Phase Constr. Servs., Inc., 318 F.R.D. 28, 37 (S.D.N.Y. 2016).  The Court may also consider "whether allowing the amendment of the pleading at this stage of the litigation will prejudice [the] defendants."  Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 244 (2d Cir. 2007).  Courts "are particularly likely to find prejudice where the parties have already completed discovery and the defendant has moved for summary judgment."  Werking v. Andrews, 526 F. App'x 94, 96 (2d Cir. 2013) (summary order).

The leniency "afforded to <u>pro se</u> litigants applies equally to procedural requirement[s] such as those established by [Rule] 16." <u>Essani v. Earley</u>, 2018 WL 3785109, at *5 (E.D.N.Y. Aug. 9, 2018), <u>report and recommendation adopted</u>, 2018 WL 4100483 (E.D.N.Y. Aug. 28, 2018). However, a plaintiff's <u>pro se</u> status alone does not establish good cause. <u>Romero v. Teamsters Union Loc. 272</u>, 2019 WL 4688642, at *8 (S.D.N.Y. Sept. 25, 2019). Moreover, even <u>pro se</u> litigants are "expected to make efforts to comply with the procedural rules of the Court." <u>Sanderson v. Leg Apparel LLC</u>, 2020 WL 7342742, at *11 (S.D.N.Y. Dec. 14, 2020).

B.      <u>Analysis</u>

Defendants contend plaintiff fails to demonstrate good cause to modify the Court's scheduling order and thus should not be permitted to file a second amended complaint after the expiration of the Court-ordered deadline.

The Court agrees.

Here, plaintiff does not dispute the instant motion is untimely. Each scheduling order agreed upon by the parties and signed by the Court clearly states the deadline to move for leave to amend or to join additional parties was June 26, 2020 (<u>see</u> Docs. ## 34, 76, 80, 99, 107), and plaintiff did not request leave to amend until December 30, 2021, in his opposition to defendants' motion for summary judgment, followed by his formal motion for leave to amend on September 16, 2022.[12]

---

[12]      In light of its November 12, 2021, Order directing the parties to serve, but not file, their summary judgment papers unless and until they informed the Court a settlement could not be reached (Doc. #139), the Court will credit plaintiff as having first requested leave to amend to add STO Building Group as a defendant on December 30, 2021, the date plaintiff's opposition brief was served on defendants, and not April 8, 2022, the date the opposition brief was filed on the docket.

Because plaintiff's motion is untimely, he has the burden to demonstrate good cause exists to modify the scheduling order.[13]  Ritchie Risk-Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC, 282 F.R.D. at 79.  Plaintiff has not done so.

First, plaintiff fails to demonstrate demonstrate diligence.

As an initial matter, plaintiff insists his delay is justified because he did not discover that STO Building Group was Pavarini's actual parent company until Yardis's deposition on July 12, 2021.[14]  But even assuming Pavarini's parent company could conceivably be held liable for plaintiff's claims, the record reflects that STO Building Group announced its ownership of Pavarini in a press release on its publicly-accessible website on June 5, 2019, more than one year prior to the June 26, 2020, deadline to move to amend.  (Doc. 168 at ECF 10).  Plaintiff could thus have easily discovered the information he needed to move to amend well before the court-ordered deadline.

In addition, plaintiff has admitted to possessing information suggesting Structure Tone Organization was not a legal entity—and thus that a different corporate entity must be Pavarini's parent company—as early as December 1, 2015.  That is the effective date of the Anti-

---

[13]     Plaintiff relies extensively the relation-back doctrine under Rule 15(c).  But when, as here, the motion for leave to amend is brought after the deadline to do so in a scheduling order, the applicability of the doctrine remains subject to plaintiff's demonstration of good cause under Rule 16(b)(4).  See, e.g., Tardif v. City of New York, 2016 WL 2343861, at *4 n.5 (S.D.N.Y. May 3, 2016) ("[C]ourts in this Circuit have applied the [good cause] analysis to circumstances that required balancing Rule 16 and relation back under Rule 15(c).").

[14]     Notably, the Court's review of Yardis's deposition transcript failed to uncover a single instance in which Yardis ever mentioned the entity "STO Building Group."  To the contrary, Yardis testified that Pavarini's parent company during the relevant time period was Structure Tone Holdings.  (Yardis Tr. at 124).  However, because plaintiff fails to demonstrate good cause to amend in the first instance, the Court need not address whether the proposed second amended complaint adequately claims against either entity.

Retaliation Policy which, as discussed in connection with plaintiff's breach of contract claim above, expressly refers to Structure Tone Organization as a "group of separate legal entities." (Anti-Retaliation Policy at ECF 2).  To the extent such a disclaimer is insufficiently precise to put plaintiff on notice of Structure Tone Organization's legal status (or lack thereof), plaintiff admits he was expressly made aware of this fact via an email from defense counsel dated February 25, 2021, more than ten months before plaintiff first sought leave to add STO Building Group as a defendant on December 30, 2021.  (Pl. Reply at 3).

Moreover, even assuming plaintiff could not have learned STO Building Group was Pavarini's parent company prior to Yardis's deposition on July 12, 2021, he offers no plausible justification for his more than five-month delay in requesting relief from the Court.  See Fioranelli v. CBS Broad., Inc., 2019 WL 1059993, at *3 (S.D.N.Y. Mar. 6, 2019) ("[C]ourts routinely deny leave to amend the pleadings if the moving party delayed in seeking leave to amend for a period of five months or more.").

Plaintiff's attempt to justify his lack of diligence by relying on his pro se status is entirely without merit.  For one, the docket reflects that as early as August 19, 2020, plaintiff was represented by pro bono counsel for discovery purposes, including discovery into corporate ownership issues.  For another, plaintiff, who holds a law school degree, is far from an unsophisticated litigant—he has promptly brought disputes before the Court in the past, and even won what he touts as a "ground-breaking" motion to reconsider one of the Court's prior orders. (See Seigel Tr. at 72–73; Doc. #66).  Plaintiff's apparent diligence in protecting his rights in this case in the past makes his lack of diligence in moving for leave to amend all the more inexcusable.  See, e.g., Langton v. Town of Chester, 2017 WL 6988708, at *5 (S.D.N.Y. Sept. 26, 2017) (no good cause when plaintiff "demonstrated an ability to adequately express her

arguments in her submissions to the Court, and has been complaint with all other deadlines"), aff'd sub nom. Langton v. Town of Chester Libr. Bd., 2020 WL 2850898 (S.D.N.Y. June 1, 2020).

Finally, defendants would suffer unfair prejudice if the Court were to grant leave to amend at this stage of the case.  The action has been pending for more than three years, discovery has long since closed, and, in light of this Court's decision granting in part and denying in part defendants' summary judgment motion, the case is now ripe for trial.  Contrary to plaintiff's suggestions, adding STO Building Group is far more consequential than merely correcting a "clerical error" (Pl. Reply at 9)—it would likely require substantial and time-consuming discovery and motion practice regarding, among other things, STO Building Group's corporate relationship with Pavarini, and the extent to which STO Building Group may be held liable for plaintiff's injuries despite the fact that Pavarini, not STO Building Group, was plaintiff's employer.

Accordingly, plaintiff's motion for leave to file a second amended complaint must be denied.

**CONCLUSION**

Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Plaintiff's motion for leave to amend is DENIED.

Plaintiff's retaliation claims under the ADA and FMLA, arising out of the termination of plaintiff's employment, may proceed.  Plaintiff's breach of contract claim may also proceed.

All other claims are dismissed.

The Court will conduct a case management conference on **November 28, 2022, at 9:30 a.m.**, at which time plaintiff and defense counsel shall be prepared to discuss, among other things, the setting of a trial date and a schedule for pretrial submissions, and what good faith efforts they have made and will continue to make to settle this case.  The conference will be held at the White Plains Courthouse, Courtroom 620.

The Clerk is instructed to terminate Structure Tone Organization as a defendant in this action.

The Clerk is further instructed to terminate the motions.  (Docs. ##152, 167).

Chambers will mail a copy of this Opinion and Order to plaintiff at the address on the docket.

Dated: October 24, 2022
       White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge